### OKLAHOMA STATE BANK OF OCHELATA v. WARD.

No. 17667.    Opinion Filed Sept. 27, 1927.

(Syllabus.)

**1. Appeal and Error—Review—Sufficiency of Evidence and Instructions.**

Where the evidence is conflicting, but there is sufficient evidence introduced by plaintiff upon which the jury could reasonably predicate their verdict, and instructions given by the court are free from error, this court, upon appeal, will not reverse the judgment.

**2. Same—Necessity for Objection at Trial to Sufficiency of Evidence.**

Where a party submits his case to the

jury without demurring to the evidence of his opponent or asking a peremptory or instructed verdict thereon, or otherwise legally attacking its sufficiency, the question whether there is any evidence reasonably tending to support the finding is not presented for review by a motion for new trial alleging insufficiency of the evidence.

**3. Same—Banks and Banking—Judgment Against Bank for Balance of Plaintiff's Deposit Sustained.**

In this case the evidence has been carefully examined, and it is held that the evidence of plaintiff is not only sufficient to be submitted to the jury, but also sufficient to warrant their finding thereon for the plaintiff.

Commissioners' Opinion, Division No. 1.

Error from District Court, Washington County; J. R. Charlton, Judge.

Action by Ida B. Ward against Oklahoma State Bank of Ochelata, Okla. Judgment for plaintiff, and defendant appeals. Affirmed.

Campbell & Ray, for plaintiff in error.

H. H. Montgomery, for defendant in error.

BENNETT, C. A civil action commenced in the district court of Washington county, Okla., May 23, 1925, wherein Ida B. Ward was plaintiff and Oklahoma State Bank of Ochelata was defendant. The jury returned a verdict for the plaintiff, and the court entered judgment thereon, and the case is appealed to this court for review. We shall refer to the parties, respectively, as plaintiff and defendant, as they appeared in the trial court. So much of the petition as is necessary here is in substance as follows:

That the plaintiff was a citizen and resident of Washington county, Okla., and the defendant was a state banking corporation with its place of business at Ochelata, Okla.; that the plaintiff on or about the 31st day of March, 1925, deposited to her credit and subject to her check with the defendant the sum of $5,000, and that the bank accepted such deposit with the understanding and agreement that it would honor and pay the checks of plaintiff up to the amount aforesaid; that subsequent thereto she drew checks against said deposit on said bank aggregating $2,944.66 which the defendant honored and paid, and that the defendant now claims that she has only a remaining balance of $4.25, whereas, in truth and in fact, she has or ought to have in said bank $2,051.15, and that she has drawn several checks upon such rightful balance, but which the defendant has refused and now refuses to pay. Wherefore, she asks judgment for the sum

last named. Defendant in its answer enters, first, a general denial; and second, alleges that on the 31st of March, 1925, S. B. Ward, the husband of plaintiff, drew a check on the defendant for $5,000, and instructed the defendant to deposit the proceeds thereof in the name of his wife, the plaintiff, which it did; that the said deposit was the money and funds of S. B. Ward, and was deposited for convenience, in the name of plaintiff, with the intent and purpose also to conceal the true ownership thereof and for the purpose of preventing creditors from fastening upon such sum in liquidation of their claims, and that all of said deposits had been paid out except the sum of $4.25 for the use and benefit of S. B. Ward. A reply by general denial was filed by the plaintiff. The defendant in its motion for new trial relies upon five specific grounds In its petition in error it makes seven assignments of error and in its brief assigns seven specifications of error, but upon the argument it confines itself to one ground, to wit, that the evidence is not sufficient to support the verdict of the jury and the judgment of the court.

This case might be summarily disposed of upon a question of practice by reason of the fact that the question here argued is not raised in the manner provided by law. See Norman v. Lambert, 64 Okla. 238, 167 Pac. 213; Muskogee Electric Traction Co. v. Reed. 35 Okla. 334, 130 Pac. 157; Reed v. Scott, 50 Okla. 757, 151 Pac. 484; Simpson v. Mauldin, 61 Okla. 92, 160 Pac. 481; Oaks v. Samples, 57 Okla. 660, 157 Pac. 739. But since defendant in error has not urged the point, and since the matter has been very earnestly presented to the court in the briefs and upon the oral argument, we prefer to deal with the question upon its merits. We shall make a short abridgment of the testimony and evidence.

Ida B. Ward, plaintiff, testified in substance that she lived four miles south of Ochelata, Okla.; that she is the wife of S. B. Ward; that in the summer of 1925, along about the 31st of March, witness had her son place $5,000 in the defendant bank.

"Q. Was that your money? A. That was sure my money. Q. How did it happen to be your money? A. Well, that place, when we lived down there by the station, that place was part mine, and when we sold it. we divided the money, and when we bought this other place up there I let him have my money, and then when he got that oil lease he paid me back my money. Q. Was that this $5,000? A. And then I put it in the bank, and, of course, a person kind of hard up, we had to pay off notes. Q. How did

you put that $5,000 in the bank? A. Well, I put it in the bank in my name; I sent it up there by my youngest boy, and told him to put it in there and tell them not to cash a check except when I signed it. Of course, I wanted to keep that money, a part of it. Q. What was your boy's name that took it up there? A. Burdell. Q. How old is he? A. He is 21 now. Q. Well, then, you drew certain checks against that fund? A. Oh, yes; I had to use—I paid the mortgage, paid the bank all we owed them out of my money, and I had to pay off several things. Of course, it has been a hard year, has been for two or three years, and I had to pay off some things. Q. Now, how much did you lack of checking out this whole deposit that you put in there, this $5,000? A. Well, I left about $2,000. Of course, I can't remember just exactly. Q. You allege in your petition $2,051.15. Is that about right? A. That is what I had ought to have had in there. Q. In the bank? A. Yes, sir. Q. Did you check against that at any time? A. Yes; I wrote checks against that, but they didn't cash them. Q. Were they protested and returned? A. Yes; I had to borrow money to pay them."

Witness says that one of the returned checks was made payable to the Shawnee Company, a loan company, for $168, and one to Bert Gaddis, which the witness thinks was for $25. Witness never had any talk with Mr. Engle about why he did not pay the checks against that money. Witness sent the boy and he brought the bank book home. Witness' youngest son, Burdell, attended to this for her. She identifies the pass book which the bank gave her, and the same is offered in evidence without objection, also a check for $1,940, which she gave to take up the mortgage on cattle, also check for $454.60 payable to Bert Gaddis, Ford dealer, a check for $500, payable to S. B. Ward, also check to G. U. Park for $50. Witness says these are the only checks that were cashed. The rest of the checks were not paid. Witness drew a check May 6, 1925, for $165 in favor of E. C. Stanard, but the bank did not pay that. Said check is introduced in evidence and is marked "Insufficient funds." The aggregate of all these checks that the witness drew is $2,944.60. Witness states that Mr. Ward, her husband, was in debt to her for money loaned to him to buy their place. She let him have all of her money, amounting to $3,000. The $2,000, the witness says she would not say belonged to her. That was paid to her out of the homestead, that is, it was paid to witness before she would sign the lease. The deposit of $5,000 was sent to the bank by the witness' youngest son, upon

whom she depends to do everything for her. His name is Burdell.

"Q. Now, Mr. Ward gave you this check and you sent it down by him (Burdell)? A. Yes, sir. Q. Did you give him any instructions as to how it was to be deposited? A. I told him to tell him never to cash no checks, but I think Mr. Engle never did—— * * * Well, my boy is right here to tell that."

Cross-examination: "We had 80 acres down at the pump station; that was sold to the Harvey people." (That is the 80 the witness claims an interest in. Witness received $3,000 out of that 80.)

"Q. Did you put any money in it when Mr. Ward bought it? Q. Sure. Didn't I work up there the same as he did? Q. I understand, but did you have any money when he bought this 80? A. Yes, I had some. Q. Can you remember where you got the money you put into this? * * * Where did you get it? A. I used to keep boarders and bake bread and everything, when we lived on the lease. Mr. Engle knows it too. Q. That is, on this 80 by the pump station? A. Before we moved on the 80 and when I moved on the 80, I had some 19 to 27 boarders. * * * Q. Did you have a bank account anywhere in your own name? A. Yes; it was in my own name. Q. Where? At what bank? A. At Ramona. Q. In your own name at Ramona? A. Yes, sir. Q. When was that? A. Well, when we moved down there. It has been 12 or 13 years ago. I can't remember just when. Q. Do you remember how much money you had in your account at any one time? A. Well, I had—yes; I had $3,000 at one time and I don't know how much I did have. I put it in there and checked it out. Q. When was that, Mrs. Ward, you had $3,000 in your account, 11 years ago? A. It has been 11 years ago. * * * Q. You didn't have any money in your name before you sold the 80, did you? A. Oh, yes; I did. * * * Q. Is it not a fact that you and Mr. Ward worked the farm there and you earned all you could, and he earned all he could, and you just kept your property together? A. Well, when we would get kind of hard up, and he had to have my money I always let him have it, and then I wanted him to pay it back when he got so he could. Q. And when Mr. Ward bought this farm where you live now he paid for it, did he? A. I paid the first payment on that farm. * * * Q. How did you make that payment? * * * A. Well, I just wrote the check for it."

Witness says that she has not had any bank account for some time because her husband needed all that she had and that she just let him have it.

"Q. You never had any account yourself? A. I let him have money for a long time.

It has been kind of hard years on the farm, and he needed it."

Witness does not know how many acres of land they have, but they had 420 in all and sold off 70 in one piece and 80 in another. Witness says that she got $2,000 out of the bonus that was paid for the lease on the farm last spring, which makes $5,000, and that she put the $5,000 in the Ochelata bank.

"Q. In other words, how did you happen to get the $2,000. How did you happen to figure out $2,000? A. How did I happen to get the $5,000, you mean? Q. No; the $2,000? * * * A. Well, I told him I wouldn't sign up them papers unless he paid me all what he owed me. Q. Paid you what he owed you? You are going to collect what he owed you? A. Yes. Q. Well, what about the $2,000? A. Well, I am telling you, ain't I? Q. Well, I know, but you didn't claim that he owed you but $3,000. A. Well, I loaned him the $3,000, and he had a right to pay me. Q. I understand, but that is not what I mean. You claim he owed you $3,000, and then you claim that you got $2,000 more out of the lease. A. Yes. Well, hadn't I a right to have my part of it? Q. Well, I understand, but what was said between you and him about that? A. Well, that was what I told him; if he didn't give me that I would not sign the papers. Q. You told him if he didn't give you $5,000 you wouldn't sign the papers? A. Yes, sir; I told him I wanted $5,000 to pay the home out. Q. You wanted the $5,000 to pay the home out? A. Yes. Q. Well, now, if that is the case, Mrs. Ward, the very same day you got this $5,000 check you wrote a check to this bank for $1,940 to pay a note? A. Yes, sir. Q. That Mr. Ward owed. You didn't owe that note, did you? A. That was on our cattle. * * * Q. They had been Mr. Ward's? He had mortgaged them? A. Yes, but he couldn't redeem the mortgage. Q. They were his cattle? A. Yes. Q. Then you paid off this note and mortgage, did you not? A. Yes, sir. Q. Out of this $5,000? A. Yes, sir. Q. It was his debt, was it not? A. Well, it was both our debts, I guess. Q. In other words, you just treated this money that was in the bank as money that belonged to both of you, did you not? A. Well, I didn't aim to. I was going to keep my part of it this time, but of course, I was not going to let the cattle go, and I paid the mortgage off of the cattle, and I paid Mr. Engle every cent I owed him, and he didn't have no right to take that out. Q. Well, then, after that was done, Mr. Ward gave you a bill of sale, did he not? A. Yes, sir."

Witness says that she did not know about Mr. Ward's having been sued in the county at that time.

"Q. You didn't know anything about it then? A. No, sir. * * * Not then. Q. The first time you saw it (pass book) was when the boy came home with it? Did he give it to you? A. Yes. * * * Q. Well, did you see any book, or did he give you any kind of a book when he came home? A. Yes, sir; he gave me that. Q. And you saw it then? A. Yes, sir. Q. You did not know what it was for, did you? A. Well, do you think I don't know anything? Q. Well, what is this book? A. Well, that is a deposit book. Q. Showing the amount of money you deposited in the bank? A. Yes, sir."

Witness says that Exhibit No. 3 was a check to pay for a Ford car. She says that it was bought by Burdell, her son; that she gave him a check and told him to buy it and she says the car was for the use of the family, and that the same was needed to carry on the business there on the farm; that the car belongs to her, but that the boy drives it. The license was taken out in the boy's name for the reason that she could not drive the car. Exhibit No. 4 is explained by the witness by saying that it was to pay taxes on the farm. She says that while the farm was in her husband's name, he had always promised to convey a part of it to her. Another exhibit, No. 5, was for borrowed money that she herself borrowed from a neighbor a couple of months before. She borrowed it before she received the $5,000 check; does not remember what she used the money for, but remembers borrowing it and remembers that she paid him back. The check for $165.80 payable to Stanard, exhibit No. 6, was to pay the interest on the mortgage on the 80 acres of land. Her husband had given a check for the interest, but it was not paid, and she gave the check to take it up.

Burdell Ward, witness for plaintiff, testified, in substance, that he lived three miles south of Ochelata; son of Ida B. Ward and S. B. Ward; 21 years old; that he made the deposit of the check in the Oklahoma State Bank for his mother, the $5,000 check; that his father gave him the check and asked him to deposit it. At the time the same was deposited that he had a conversation with Mr. Engle of the bank; that witness told him not to cash any checks on the account without his mother's signature. He said first she told him to do that and later he said that she did not tell him, but that he did it anyhow. The bank gave him the pass book, which he gave to his mother. The pass bok is exhibit No. 1.

Cross-examination: Does not know exactly why he told the banker not to cash

any checks other than those written by his mother, except that he knew that some checks had been written on his father's account and signed by other people.

J. D. Engle, for defendant: Lives at Ochelata; cashier of defendant bank; have been such for eleven years; is acquainted with S. B. Ward and his wife and Burdell Ward. Had known them for 15 years. Witness had personal knowledge of the transaction Mr. Ward had with some parties which resulted in the sale of the gas lease on his farm and the payment to Mr. Ward of $7,000 bonus. Witness advised Mr. Ward in the putting over of this deal. Mr. Ward, along with some other parties, sold some parties in Wichita Falls an oil and gas lease, and they sent the leases along with a draft for $12,250. Mr. Ward was to get $7,000. The others were to get the balance. The money came back in about six days. Witness had a conversation with Mr. Ward before the money came back. The $7,000 came back to the bank March 26th, but Mr. Ward did not know it. The $7,000 was put to the credit of Mr. Ward in the bank, and on the next day after Mr. Ward was advised that the money had come a check for $5,000 was sent in to the bank payable to his wife. It was brought in by Burdell Ward and witness deposited this check to Ida B. Ward's account, that is, $5,000; that Burdell had a check signed by his mother in blank to pay the note and interest secured by mortgage on cattle for $1,940. This was charged to the account of Ida B. Ward, that is, to the $5,000 account, and the mortgage was released and, the note given to the boy.

"Q. Then, afterwards, how was the account handled by the bank, about checks that were charged up, and so on? A. Oh, when Mr. Ward had money we charged his checks to his account, but when he did not have any we charged them to Ida B. Ward's account. * * * Q. Did S. B. Ward know that you had charged another note which was in the bank, which he owed, to the account which was in his name along about this time? * * * A. I told Mr. Ward I was going to, but I never saw him afterwards and told him I had. * * * Q. You told him you were going to charge that to his account? A. No, sir; I told him I was going to take the money while it was there. Q. And charge it to his account? A. No; I didn't say that. Q. When Mr. Ward told you that he was going to place this money in his wife's account, what was it that he said in regard to a prospective suit? * * * A. Why, his exact words, as near as I can quote them were, 'on account of that bond

suit, when that money comes back here I am going to place $5,000 in the old lady's account and let her——' * * * Q. Did you know anything about, or had he told you anything about, the bond suit prior to that? * * * A. Oh, we just talked about it in a casual way."

Cross-examination: Plaintiff made a $5,-000 deposit in witness' bank; it was placed to plaintiff's credit and a pass book was made out and given her which showed that plaintiff had $5,000 on deposit. **Witness never had any conversation at all with plaintiff about the deposit.**

Plaintiff. wrote checks for $2,944.60, or thereabouts, which were cashed and the same charged to plaintiff's account, and after that other checks came in which were refused, and the checks were returned unpaid. Did not pay them because plaintiff had no more money. Witness charged up against this account checks made by S. B. Ward amounting to about $2,000, that is, S. B. Ward's checks were charged to the $5,000 account of Mrs. Ida B. Ward, and that because S. B. Ward's checks were charged to the $5,000 account it left practically no money to the account of Mrs. Ida B. Ward and therefore her checks were turned down.

"Q. And that is the reason you would not pay her checks? A. Yes, sir. Q. Because you charged up S. B. Ward's checks? A. Yes, sir. Q. Now, she never told you at any time to charge his checks up to her account, did she, A. No, sir. Q. You had no instructions as to that? You just did it? A. I did it because it was Mr. Ward's money. Q. Well, I say, you just did it on your own volition, did you not? A. Yes, sir. Q. Nobody authorized you to do it? A. I did that in the place of returning the checks. Q. Well, I say, nobody authorized you to do it, did they? A. No."

Witness further testified that at the time the $5,000 was taken out of S. B. Ward's account by his check to Ida B. Ward, there remained in the account of S. B. Ward $2,-000.

"Q. And you paid his checks as long as that $2,000 was to his credit, did you not? A. Well, he had this $2,000 and then he had some deposits after that. Yes, sir. We paid his checks whenever he had the money. Q. And when his $2,000 ran out, then you charged up his checks against the other account, did you not? A. Yes, sir; when Mr. Ward didn't have the money we charged the checks to Mrs. Ward's account. Q. Well, now, Mr. Ward did not know he was out of money, did he? A. Oh, yes; he knew that, because I told him I was going to take the money. I tried to get him to give me a check for it and he wouldn't do

it. Q. But you told him? A. I told him I was gonig to take the money while it was there; it would soon all be gone. Q. And he wouldn't give you a check? A. No, sir; he said the reason he wouldn't give me a check he wanted Oaf to pay his part of the note. * * * Q. Well, Mrs. Ward is right in her contention that if you had not charged up Mr. Ward's checks to her account she would still have in the bank approximately $2,051. Is she not? A. Yes, sir."

Re-direct:

"Q. Mr. Engle, counsel asked you about a conversation you had with Mr. Ward in which you told him you were going to charge this note to his account because the money would soon be all gone. What else was said in that conversation? A. He said not to do that; that he wanted Oaf to pay his part of that note. By way of explanation, Oaf is his other boy, who was the first signer on this note. Q. Did he say anything else at that time about the money, there would be plenty of money, or something like that? A. Nothing, only he said 'the old lady's money is all there'. That is when I was out to Mr. Ward's house to get him to give me a check for this second note."

Defendant introduced a petition filed in a suit in the district court of Washington county against Clarence O. Ward, S. B. Ward and Lo Sitah Bible, and it is admitted by counsel for defendant that this suit was dismissed several months later. This suit appears to have been for $10,000 on an appearance bond given for the appearance of one Clarence C. Ward before the district court of Bryan county to answer certain charges there pending. The justification of S. B. Ward on the bond is that he is worth $10,000 over and above all debts, liabilities and exemptions allowed by law.

The foregoing is in substance the testimony in the case. It is the contention of tne defendant in this case that there is no evidence even in its most favorable aspect reasonably tending to sustain the verdict of the jury in this case. With this contention we cannot agree. There is nothing whatever before this court except the statement in cold print of the witnesses. We have not the benefit of acquaintance with these witnesses. We do not know their habits nor their character. They all stand before us unchallenged, unless the evidence itself so discounts them that we must conclude that the statement of plaintiff and her witnesses is so inherently improbable and unreasonable as to cause us to say that it amounts to nothing and does not rise to the dignity of substantial evidence. We have in mind, of course, the duty of the court to regard with great care transactions between husband and wife, and that those transactions must be scanned closely to discover whether or not they are fraudulent. But, on the other hand, there is nothing in the relationship which in itself would justify the court in disregarding a plain straight-forward statement of the facts made by one of the parties for the sole reason that it had reference to a transaction between husband and wife.

In this case, first, we have a statement of the wife, the plaintiff, that her husband owed her $3,000 which was money, the proceeds of her own earnings from the keeping of boarders and lodgers. When asked on cross-examination how she kept that money, she answered that it was on deposit in her own name in a bank at Ramona. Perhaps the court should take judicial knowledge of the fact that Ramona is not many miles distant from Bartlesville, and that records of that kind can be verified with the least effort. The plaintiff also says that from time to time, when the needs of the farm or the necessities of circumstances required it, she gave her husband the use of her money. She also testified that she made the first payment by check on her own account to cover the first payment on the homestead lands, the lease on which was sold for the $7,000 mentioned in this controversy. Throughout her testimony it may be seen that while she helped her husband with her money, as well as with her earning power, she had in her mind and it was also present in his mind as shown by the testimony, that these sums would be repaid when his circumstances were more favorable. She testified that it was the understanding that he should convey to her a part of the land, but he had not done so. There seems to be nothing inherently improbable in these statements or either of them. It is a matter of common ordinary observation that such incidents do arise, not merely now and then, but often in human affairs, where the wife, at one with her husband, intent upon creating an estate and raising a family, throws in with him her all with the understanding on the part of both that she shall be paid back, or that the proceeds of the money will be at a proper time divided between them, and there is nothing here to contradict in any way these statements.

And now appears a windfall, a streak of fortune, the probability of oil in the neighborhood, the lands become vvaluable for leasing purposes. The frugal old soul realizes that perhaps her husband can now re-

pay her the amount she has advanced to him, and, in no uncertain speech, she makes known to him that before she would consent to sign the papers—this oil and gas lease on their land and homestead—she will expect the repayment to her of $3,000 already loaned to him, and also that she should have $2,000 for her interest in the lease itself, making in all $5,000, and that her husband agreed to give her the $5,000 when the money should come in. The plaintiff says that at the time she knew nothing of the suit because there was no suit to her knowledge against her husband. But suppose she did know of such a suit. If the debt of $3,000 was a bona fide debt we know of no reason why in law or good morals the husband should not pay it, nor can we conjure up any plausible reason why she should not receive it. If this lease covered her homestead and she chose to make a condition of her signing that she be paid $2,000 out of the proceeds, we know of no reason why she should not do so; and if our assumption that this was a bona fide debt, that there was a bona fide refusal by her to sign the lease on the homestead until and unless she were paid, is correct, the mere fact that her husband had been sued on a bond for $10,000, or any other amount, should have no weight in this matter, for, so far as we know, there is no law in Oklahoma that will prevent a debtor from preferring any one or more of his creditors in good faith to secure a valid debt. Section 6025, C. O. S. 1921, reads as follows:

"Any person in this state indebted to other persons shall have the right to prefer one or more of such creditors in good faith to secure a valid debt, which preference may be manifested by payment, by mortgages, either real or chattel, or by the transfer of personal property or real estate, and if received by the creditor in good faith, such conveyance or mortgage shall be valid in the hands of the mortgagee and constitute a preference to the extent thereof, subject to the laws relating to the filing and recording of mortgages."

See, also, Swan v Bailey, 71 Okla. 30, 174 Pac. 1065, wherein the court holds:

"A bona fide pre-existing debt owing a wife by her husband forms a good and sufficient consideration for a conveyance or transfer by the husband of his real estate, either in payment or as security for such debt."

The court in the opinion uses these words:

"Where the conveyance is made, even though by an insolvent, for the purpose of discharging an indebtedness incurred in good faith, and the bona fides of the con-sideration is not attacked, other than by possible inference or a belief that possibly the transaction was colorable, courts will not undertake to defeat the will of such grantor, even though it have the effect of preventing other creditors from subjecting the property in satisfaction of their indebtedness."

Accepting as true, therefore, all the evidence tending to establish plaintiff's cause, together with the reasonable inferences to be drawn therefrom, and omitting from our consideration all evidence to the contrary, as we are required to do in cases of this kind, the facts may be summed up as follows: Plaintiff deposited $5,000 of her money in defendant bank and checked out of said account only $2,944.60, leaving a balance in bank to plaintiff's credit of $2,051.15; that defendant, without her knowledge or consent, charged to her account checks drawn by her husband for about $2,000; that this money so deposited with defendant represented her individual earnings with the exception of about $2,000, which latter sum was paid to her out of the proceeds of the sale of an oil and gas lease on lands including her homestead. That she had not only an interest in the homestead lands as such, but that she had paid a part of the purchase money therefor out of her own earnings; that when the deposit was made the bank was notified that this was her individual money, and also notified not to cash any checks out of this account that were not signed by the plaintiff; that the plaintiff knew nothing of the suit against her husband at the time the $5,000 was deposited. The fair inference from the testimony would indicate that her husband owned about 270 acres of land in prospective oil territory, and that he is worth $10,000 over and above all debts, liabilities, and exemptions allowed by law. It may fairly be inferred also that the defendant bank had knowledge of the various dealings by and between the plaintiff and her husband, and that the bank aided them in such dealings and advised them in the premises. These facts are abundantly sufficient, not only to carry the case to a jury, but to warrant the finding set out in the record.

The defendant says Ward and wife entered into a conspiracy to defraud the bank. Somehow we are unable to see it, and especially since, according to the testimony of the bank, every step taken by them was made known to the bank. If it be their contention that the deposit of $5,000 in the name of the wife was a fraud, the bank

had advance knowledge of the fraud and became a willing party to the scheme by offering its facilities, if not its advice, for the purpose named. But it should be remembered that any evidence of this kind is to be treated as withdrawn for the purpose of this discussion. The law in the case is comparatively simple.

"It is a well-settled rule of this court that where the testimony on any material issue is conflicting, and there is any competent evidence in the record reasonably tending to support the finding of the jury, this court will not review the evidence to ascertain where the weight lies, nor interfere with such findings." Stekoll v. Lebow, 96 Okla. 76, 219 Pac. 899; Berquist v. Thomas, 86 Okla. 214, 207 Pac. 964, and numerous cases cited.

"In law actions, where disputed questions of fact are submitted to a jury, the jury's verdict and the judgment rendered thereon will not be disturbed on appeal, where there is any evidence reasonably tending to support the same." Sharum v. Sharum, 121 Okla. 53, 247 Pac. 97.

"Nor will this court reverse the judgment of the trial court resting upon a verdict of the jury, on the ground of insufficient evidence to support the verdict, even though the evidence be such that reasonable men might arrive at different conclusions. The jury has the benefit of judging the weight to be given the words of the witness, by manner and demeanor of the witness while testifying, which elements may sometimes weigh stronger than the words." Craig & Wall v. Plummer, 91 Okla 193, 217 Pac. 172; Fitch v. Braddock, 93 Okla. 78, 219 Pac. 703; Chortney v. Curry, 99 Okla. 69, 225 Pac. 950.

"On a challenge to the sufficiency of the evidence to support the verdict, the question presented on appeal is, admitting the truth of all the evidence of the plaintiff, together with such inferences and conclusions as may reasonably be drawn therefrom, eliminating all evidence of defendant in conflict with plaintiff's evidence, and all opposing inferences, whether there is any competent evidence tending to support the verdict against defendant" Moses v. Harris et al., 111 Okla. 54, 237 Pac. 591.

"It is a settled rule that a demurrer to the evidence admits every fact which the evidence in the slightest degree tends to prove and all inferences or conclusions that may be reasonably and logically drawn from the evidence. This court will consider as withdrawn all evidence which is most favorable to the party demurring." Forry v. Brophy, 116 Okla. 99, 243 Pac. 506.

In this case the jury passed upon the issues under instructions which were so favorable to the contention of the defendant that they provoked no exceptions whatever. The court instructed the jury that if said $5,000 deposit was the property of plaintiff's husband, S. B. Ward, and was deposited to the credit of the plaintiff for the purpose of defrauding his creditors, their verdict should be for the defendant. The issue was clean-cut, squarely presented, and passed upon by the jury. There was sufficient evidence to warrant the finding and their verdict and the judgment thereon should be and the same is therefore affirmed.

TEEHEE, REID, LEACH, and FOSTER, Commissioners, concur.

By the Court: It is so ordered.

Note.—See under (1) 4 C. J. p. 859, §2836; 2 R. C. L. p. 194; 1 R. C. L. Supp. p. 433; 4 R. C. L. Supp. p. 90; 5 R. C. L. Supp. p. 79; 6 R. C. L. Supp. p. 73. (2) 3 C. J. p. 746, §638; p. 839, §746; 26 R. C. L. p. 1044. (3) 7 C. J. p. 669; §376.